FILED
IN OPEN COURT

DEC 1 7 2012

CLERK, U.S. DISTRICT C
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:12CR 5 2 1 |
| | ) | |
| CHAD DIXON, | ) | |
| | ) | |
| Defendant. | ) | |

STATEMENT OF FACTS

The United States and the defendant, CHAD DIXON ("DIXON"), agree that had this

matter proceeded to trial, the United States would have proven the following facts beyond a

reasonable doubt with competent and admissible evidence:

I.    INTRODUCTION

        1.      DIXON owned and operated a company known as Polygraph Consultants of

America ("PCA"), which offered services to teach customers to pass any polygraph examination

even if the customer was lying.  PCA's principal place of business was DIXON's home in

Marion, Indiana.

        2.      DIXON established a toll-free telephone service for PCA in November 2010.  All

calls made to the toll-free number were automatically forwarded to DIXON's personal cellular

telephone.

        3.      DIXON advertised PCA's services using a website that he created.  DIXON's

website included a page containing contact information, including his toll-free telephone number

and an e-mail address.  E-mail messages sent to the e-mail address listed on DIXON's website

were answered by DIXON personally.

1

4. DIXON accepted payment for polygraph countermeasures training both in cash and through a credit card processing company. Payments made to DIXON by credit card appeared on purchasers' credit card billing statements as payments to "Expert Services." DIXON used the same credit card processing company for his legitimate electrical contracting business, called "Expert Electric."

5. United States Customs and Border Protection ("CBP") is a federal law enforcement agency of the United States Department of Homeland Security charged with enforcing U.S. regulations regarding immigration, international trade, customs, and drugs. CBP's primary mission is to prevent terrorists and terrorist weapons from entering the United States and ensuring the security of our nation at America's borders and ports of entry.

6. United States Office of Personnel Management ("OPM") conducts suitability investigations and makes determinations regarding suitability for employment in the U.S. government competitive service for certain job applicants, including applicants for CBP Protection Officer, Border Patrol Agent, and Air and Marine Interdiction Agent positions. Title 5 of the Code of Federal Regulations, Part 731 – Suitability, requires that OPM, or an agency with authority delegated from OPM, ensure that such applicants are of good character and conduct, and that employment of any such applicant would not have an adverse impact on the government. OPM delegates authority to CBP to conduct suitability determinations and security background investigations.

7. In determining whether a person is suitable for federal employment, OPM and CBP consider the following factors: misconduct or negligence in employment; criminal or dishonest conduct; material, intentional false statement, or deception or fraud in examination or appointment; refusal to furnish testimony; alcohol abuse; illegal use of narcotics, drugs, or other

controlled substances; knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force; any statutory or regulatory bar which prevents the lawful employment of the applicant; the nature of the position for which the person is applying; the nature, seriousness, circumstances, recency, and the applicant's age at the time of the conduct; contributing societal conditions; and the absence or presence of rehabilitation or efforts toward rehabilitation.

8.      CBP receives authority annually from OPM to conduct pre-employment polygraph examinations for law enforcement applicants as part of a statutorily mandated suitability determination and security background investigation. The Anti-Border Corruption Act of 2010 required, in part, that by 2013 all CBP law enforcement applicants, including Border Protection Officers, Border Patrol Agents, and Air and Marine Interdiction Agents, submit to a pre-employment polygraph examination before being hired by CBP.

9.      The National Center for Credibility Assessment ("NCCA") defines countermeasures as "[a]nything which effectively negates or mitigates an adversary's ability to exploit vulnerabilities. In polygraph, (countermeasures) refers to any action(s) taken to affect the outcome of a PDD (Psychophysiological Detection of Deception) examination" including behavioral, mental, pain, pharmacological, physical and spontaneous actions.

10.     In or around March 2009, Applicant A applied for the federal law enforcement position of CBP Air Interdiction Agent, a position with a starting salary of approximately $57,408, that is subject to a pre-employment polygraph examination administered by CBP's Office of Internal Affairs, Credibility Assessment Division ("IA-CAD"). Applicant A resided in New York.

11.     In or around September 2010, Applicant B applied for the federal law enforcement position of CBP Border Patrol Agent, a position with a starting salary of approximately $38,619, that is subject to a pre-employment polygraph examination administered by CBP IA-CAD.  Applicant B resided in California.

## II.     The Scheme to Defraud

12.     From in or about November 2010 and continuing through in or about April 2012, within the Eastern District of Virginia and elsewhere, DIXON and others, aided and abetted by each other, did knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

13.     The purpose of the scheme was for DIXON to enrich himself by training federal job applicants and federal employees, among others, in polygraph countermeasures and assisting them in deceiving the federal government in exchange for money.

14.     A further purpose of the scheme was to defraud the United States and obtain and maintain federal employment for DIXON's customers through materially false and fraudulent statements and representations, as well as through the use of polygraph countermeasures.

### A.  *Polygraph Consultants of America*

15.     Through PCA, DIXON advertised customized training sessions in polygraph countermeasures that guaranteed a customer would pass any polygraph examination in the world even if the customer lied during the examination.

16.     DIXON's website for PCA indicated, "It makes no difference if your[sic] being truthful or bold face lying we will teach you how to produce truthfull[sic] charts guaranteed. Your personal instructor is an expert in teaching people just like you how to pass any polygraph

4

exam. Equally important, there is no way anybody will be able to tell that you have been trained. The end result is the same every time, and that's you passing your examination guaranteed!"

17.    DIXON provided private training sessions to his customers, including applicants for federal law enforcement and national security positions, either by traveling to the customer or providing the training near DIXON's hometown of Marion, Indiana.

18.    In order to customize the polygraph countermeasures training, DIXON solicited and learned information from his customers, separately and individually, regarding the purpose of the polygraph examination and the information his customers, separately and individually, needed, wanted, or intended to conceal during the polygraph examination.

19.    In order to manipulate the natural outcome of polygraph examinations, conceal material information, and facilitate false statements his customers intended to make during polygraph examinations, DIXON taught his customers physical and mental countermeasures designed to defeat, disrupt, and obstruct polygraph examinations administered by various departments or agencies of the United States, including CBP and other federal agencies within the U.S. intelligence community.

20.    In order to aid the concealment of his customers' false statements, and to help his customers obtain federal employment fraudulently, DIXON instructed his customers to lie and deny receiving polygraph countermeasures training.

21.    During pre-employment polygraph examinations administered by the federal government, including CBP, DIXON's customers used countermeasures learned from DIXON to conceal material information. Further, as instructed by DIXON, DIXON's customers falsely stated that they had not received countermeasures training.

5

22.     DIXON was paid approximately $1,000 per day, plus travel expenses, to train his customers in the use and application of polygraph countermeasures.

23.     DIXON also provided private polygraph countermeasures training to nine convicted sex offenders who are currently under state court-ordered supervision, either probation or parole, and who were mandated to take polygraphs as a condition of their supervision while residing in their communities, including:

a.  A 35-year-old man residing in Herndon, Virginia, convicted in 2008 for peeping, who is currently under the supervision of the Sex Offender Unit of the Department of Corrections in Fairfax, Virginia;

b.  A 52-year-old man residing in Bethesda, Maryland, convicted of sexual abuse of a minor in 2009, who is currently under the supervision of the Department of Public Safety and Correctional Service in Frederick, Maryland;

c.  A 46-year-old man from Aurora, Texas, convicted in 1986 for sexual assault of a minor, who is currently under the supervision of the Texas Department of Criminal Justice in Mineral Wells, Texas;

d.  A 55-year-old man residing in New York, New York, convicted in 2011 for sexual assault of a minor, who is currently under the supervision of the New York City Department of Probation;

e.  A 42-year-old man of Seminole, Texas, convicted in 2004 of attempted sexual battery of a minor, who is currently under the supervision of the Adult Probation Department in Seminole, Texas;

f. A 39-year-old man from Carrolton, Texas, convicted in 2009 of indecent sexual contact with a child, who is currently under the supervision of the Sex Offender Unit of Dallas County Community Supervision based in Dallas, Texas;

g. A 39-year-old man residing in Raleigh, North Carolina, convicted of sexual battery in 2010, who is currently under the supervision of the North Carolina Department of Public Safety;

h. A 30-year-old man residing in Commerce City, Colorado, who failed to register as a convicted sexual offender, and who is currently under the supervision of the Colorado Division of Parole based in Westminster, Colorado; and

i. A 53-year-old man residing in Quincy, Illinois, convicted of a child pornography related offense on December 20, 2010, and who is currently under the supervision of the Adams County Probation Department located in Quincy, Illinois.

24. Also, DIXON provided polygraph countermeasures training to a 51-year-old California man who pleaded guilty on November 14, 2011, to one felony count of knowing transportation of child pornography and was recently sentenced in the U.S. District Court for the Central District of California.

25. In addition, DIXON provided private polygraph countermeasures training to two individuals who sought the training while they were under investigation for sex-related offenses, including a 62-year-old man in Marion County, Oregon, and a 51-year-old man in Dickenson, Texas.

26. Furthermore, DIXON provided private polygraph countermeasures training to two federal contractors holding security clearances: a 48-year-old contractor to a federal agency within the intelligence community, who currently possesses a Top Secret/Sensitive

7

Compartmented Information security clearance; and a 46-year-old contractor with a Top Secret security clearance, who has been employed by the U.S. Drug Enforcement Agency and Federal Deposit Insurance Corporation.

B. *DIXON's Training of Applicant A in Indianapolis, Indiana*

27.     On or about April 13, 2011, in order to gain information about the services offered by DIXON's company, PCA, Applicant A placed a telephone call to the toll-free number listed on PCA's website and spoke with DIXON.

28.     On or about April 13, 2011, DIXON and Applicant A agreed to meet in Indianapolis, Indiana. Applicant A purchased plane tickets to and from Indianapolis, Indiana, using Applicant A's MasterCard credit card.

29.     On or about April 18, 2011, DIXON met Applicant A at a hotel in Indianapolis, Indiana, where he taught Applicant A physical and mental polygraph countermeasures. DIXON also provided Applicant A with training materials titled "ALWAYS PASS EVERY TIME NO MATTER WHAT".

30.     On or about April 18, 2011, after Applicant A advised DIXON that he had applied for a position with CBP and was required to take a Law Enforcement Pre-Employment Test ("LEPET"), a suitability polygraph examination, DIXON revealed to Applicant A that he had provided polygraph countermeasures to other federal job applicants.

31.     On or about April 18, 2011, during an approximately eight-hour training session, DIXON taught Applicant A physical and mental polygraph countermeasures that DIXON knew would be used corruptly to influence, obstruct, and impede the CBP pre-employment polygraph examination that Applicant A was required to take, and that were designed to allow Applicant A to conceal lies and false statements.

32.     On or about April 18, 2011, DIXON instructed Applicant A, if he was asked, to deny receiving polygraph countermeasures training.

33.     On or about April 18, 2011, DIXON received approximately $1,050 from Applicant A for the polygraph countermeasures training, which was paid for using Applicant A's MasterCard credit card.

34.     On or about April 19, 2011, Applicant A participated in a pre-employment polygraph examination at a CBP office in Buffalo, New York, as part of a CBP suitability determination and security background investigation. Before the pre-employment polygraph examination, the CBP polygraph examiner advised Applicant not to attempt to manipulate information collected during the polygraph examination and warned Applicant A that any attempt to manipulate the examination could result in termination of the polygraph examination process.

35.     On or about April 19, 2011, Applicant A used physical and mental countermeasures while taking a pre-employment polygraph examination in a corrupt endeavor to influence, obstruct, and impede the examination.

36.     On or about April 19, 2011, during his pre-employment polygraph examination, Applicant A concealed the fact that he received polygraph countermeasures training from DIXON the previous day and falsely stated to the CBP examiner that Applicant A had not conducted research, reviewed any training materials, or received training on polygraph countermeasures.

37.     On or about April 20, 2011, DIXON and Applicant A caused CBP to transmit by wire Applicant A pre-employment polygraph examination report from a CBP computer in Buffalo, New York, to CBP servers in Newington, Virginia.

9

C. *DIXON's Training of Applicant B in Indianapolis, Indiana*

38.     In or around March 2011, after learning that he had been selected to submit to a suitability polygraph examination, Applicant B searched the internet for resources for polygraph examination training and identified the website www.expertpolygraphtraining.com, which DIXON operated as a website for PCA. On or about March 28, 2011, in order to gain information about the services offered by PCA, Applicant B placed a telephone call to the 1-800 number listed on PCA's website and spoke with DIXON.

39.     On or about March 31, 2011, Applicant B and DIXON communicated by telephone, discussed the polygraph countermeasures training services offered by DIXON, and agreed to meet for a polygraph countermeasures training session in Indiana.

40.     On or about April 4, 2011, DIXON met Applicant B, who traveled from San Diego, California to Indianapolis, Indiana, at a hotel in order to receive training in polygraph countermeasures.

41.     On or about April 4, 2011, DIXON was told by Applicant B that Applicant B had applied for a Border Patrol Agent position with CBP.

42.     On or about April 4, 2011, DIXON provided Applicant B with training materials and instructed Applicant B on how to employ various physical and mental polygraph countermeasures, which DIXON knew would corruptly influence, obstruct, and impede the CBP polygraph examination and were designed to allow Applicant B to conceal lies and false statements.

43.     On or about April 4, 2011, DIXON, knowing that the question of whether Applicant B received polygraph countermeasures training was material to the CBP's polygraph examination, instructed Applicant B to deny receiving polygraph countermeasures training if he

was asked by the CBP polygraph examiner since such training would disqualify Applicant B from the hiring process.

44.     On or about April 4, 2011, DIXON received approximately $1,000 in cash from Applicant B at the conclusion of the training session.

45.     On or about April 18, 2012, Applicant B participated in a Law Enforcement Pre-Employment Test ("LEPET"), a suitability polygraph examination, at a CBP office in San Diego, California.  Before the polygraph examination, the CBP polygraph examiner advised Applicant B not to attempt to manipulate information collected during the polygraph examination and warned Applicant B that any attempt to manipulate the examination could result in termination of the polygraph examination process.

46.     On or about April 18, 2012, Applicant B used physical and mental countermeasures during the polygraph examination in an endeavor to corruptly influence, obstruct, and impede the examination.

47.     On or about April 18, 2012, Applicant B repeatedly lied to the CBP examiner, telling the examiner that Applicant B had not conducted research, reviewed any training materials, or received training on polygraph countermeasures.

48.     On or about April 18, 2012, DIXON and Applicant B caused CBP to transmit by wire Applicant B's polygraph examination report from a CBP computer in San Diego, California, to CBP servers in Newington, Virginia, within the Eastern district of Virginia.

   D.  *DIXON's Training of UC1 in Alexandria, Virginia*

49.     On or about November 23, 2011, DIXON told a CBP Special Agent ("UC1"), acting in an undercover capacity as a CBP Protection Officer applicant, that he provides an 8-hour, one-day training course that enables an individual to produce polygraph chart tracings that

conceal indicators of deception, using behavioral, physical, and mental exercises, regardless of whether an individual is lying or not. Explaining that he would teach UCI "what to say" and "what not to say," DIXON said that 14,311 individuals had received his training program and none of them had failed their polygraph examination.

50.     On or about December 2, 2011, DIXON told UCI that DIXON offered a training program designed for Department of Defense Polygraph Institute pre-employment examinations. UCI advised DIXON that UCI applied for a federal Customs and Border Protection Officer position. DIXON agreed to travel to Arlington, Virginia, to meet with UCI for polygraph countermeasures training.

51.     During a subsequent telephone conversation on or about December 2, 2011, DIXON said that he would teach UCI to produce a truthful polygraph chart tracing even if the answer was ridiculous. For example, UCI could answer, "Yes," to the question, "Did you fly an airplane into the World Trade Center on 9/11?" and still produce a truthful polygraph chart tracing.

52.     On or about December 8, 2011, within the Eastern District of Virginia and elsewhere, DIXON, for the purpose of executing the scheme and artifice described above, knowingly caused to be transmitted by wire communications in interstate commerce an e-mail sent from Arlington, Virginia, to Indiana containing the name, address, and telephone number of the hotel where UCI and DIXON would meet for the polygraph countermeasures training.

53.     On or about December 9, 2011, DIXON met UCI at a hotel in Arlington, Virginia, for polygraph countermeasures training. DIXON met UCI in the hotel lobby and escorted UCI to a guest room in the hotel, where the training was conducted.

54.     During the polygraph countermeasures training provided on or about December 9, 2011, UC1 told DIXON that UC1 had to "beat" the polygraph examination and needed DIXON to teach UC1 how to lie to gain employment with CBP. DIXON provided UC1 with a training packet titled, "ALWAYS PASS EVERY TIME NO MATTER WHAT."

55.     During the training session, UC1 told DIXON that UC1 currently used illegal drugs and did not disclose this information on UC1's security background investigation forms or during UC1's security background interview. DIXON instructed UC1 not to reveal UC1's current criminal drug activity. DIXON also instructed UC1 to state falsely that UC1 had only used illegal drugs more than eight years ago.

56.     Further, UC1 told DIXON that, while previously employed as a "jailer" in a Texas prison, UC1 accepted bribes to smuggle contraband to inmates. UC1 told DIXON that, while under investigation for that conduct, UC1 resigned from the prison before being terminated or prosecuted. UC1 told DIXON that UC1 did not disclose this information on UC1's security background investigation forms or during UC1's security background interview.

57.     DIXON told UC1 that if CBP learned of UC1's undisclosed employment circumstances and resignation, UC1 would not be hired by CBP. DIXON instructed UC1 not to reveal UC1's past criminal activities at the Texas prison.

58.     During the training session, DIXON taught UC1 behavioral, physical, and mental polygraph countermeasures designed to defeat and disrupt CBP's pre-employment polygraph examination.

59.     UC1 paid DIXON a total of approximately $2,800 for the polygraph countermeasures training. DIXON demanded a $1,000 down payment which UC1 provided in

the form of a U.S. Postal Money Order, and the remaining $1,800 in cash paid at the training session.

E. *Second Undercover Operation in Alexandria, Virginia*

60.    On or about March 1, 2012, DIXON agreed to travel to Alexandria, Virginia, to provide polygraph countermeasures training to a state law enforcement officer ("UC2"), who was acting in an undercover capacity as a CBP Border Patrol Agent applicant.

61.    On March 9, 2012, DIXON met UC2 at a hotel in Alexandria, Virginia, for countermeasures training. UC2 told DIXON that UC2 was concerned about omitting requested information from UC2's security background investigation forms. Specifically, UC2 told DIXON that UC2's brother ("Brother"), with whom UC2 had a close relationship, was a Mexican citizen and a member of Los Zetas drug cartel involved in murder, robbery, and extortion. UC2 explained to DIXON that UC2 deliberately failed to list Brother on the security background investigation forms and had previously loaned Brother UC2's U.S. Passport in order for Brother to enter the United States from Mexico illegally. Additionally, UC2 told DIXON that, while in Mexico, UC2 had sexual intercourse with a minor.

62.    DIXON told UC2 that if CBP was aware that Brother was a member of Los Zetas cartel, UC2 would not be hired by CBP. Additionally, DIXON said that he was not concerned about UC2's sexual contact with a minor because the minor was not DIXON's child.

63.    On or about March 9, 2012, DIXON provided UC2 with a training packet titled "ALWAYS PASS EVERY TIME NO MATTER WHAT." DIXON's training packet directed law enforcement applicants, "Do not tell the polygrapher anything that isn't already a matter of record and certainly do not admit to anything that could disqualify you."

14

64.     On or about March 9, 2012, DIXON provided UC2 with a material false statement to tell his polygraph examiner if asked about Brother during the pre-employment polygraph examination.  Despite learning that UC2 had frequent contact and maintained a close relationship with Brother, DIXON directed UC2 that if he was confronted about his relationship to Brother that UC2 should lie and claim that UC2 omitted Brother from the security background investigation forms because UC2 had limited contact with Brother and did not consider him a true relative.

65.     During the approximately seven-hour training session, DIXON instructed UC2 in behavioral, physical, and mental polygraph countermeasures designed to defeat and disrupt the CBP pre-employment polygraph examination.

66.     At the conclusion of the training session, UC2 paid DIXON approximately $2,500 in cash, which was in addition to approximately $1,000 UC2 previously sent DIXON.  UC2 told DIXON that the payment for the polygraph countermeasures training was provided by Brother, the member of Los Zetas Drug Cartel.  DIXON told UC2 to "thank your brother" for the payment.

67.     On March 12, 2012, a CBP Special Agent posing as UC2 sent an e-mail to DIXON asking how to respond to certain questions that would be asked by CBP during the pre-employment polygraph examination.  Three days later, DIXON answered the e-mail, advising UC2 to utilize polygraph countermeasures in response to each of the questions asked in the March 12, 2012, email.

68.     On March 20, 2012, UC2 told DIXON by e-mail that UC2 passed the CBP pre-employment polygraph examination and had a friend who wanted to contact DIXON concerning

15

polygraph countermeasures training.  DIXON responded that UC2 could provide the friend with DIXON's cellular telephone number and email.

\*                  \*                  \*

69.     The defendant realized proceeds of at least $17,091.07as a result of the fraudulent scheme.

70.     The defendant's actions, as recounted herein, were in all respects intentional and deliberate, reflecting an intention to do something the law forbids, and were not in any way the product of any accident or mistake of law or fact.

71.     The foregoing Statement of Facts is a summary of the principal facts that constitute the legal elements of the offenses of obstruction of an agency proceeding and wire fraud.  This summary does not include all of the evidence that the government would present at trial nor all of the relevant conduct that would be used to determine the defendant's sentence under the Sentencing Guidelines and Policy Statements.

Respectfully submitted,

Neil H. MacBride                         Jack Smith
United States Attorney                    Chief, Public Integrity Section
Eastern District of Virginia             United States Department of Justice

By:  _____            By:  _____
     Uzo E. Asonye                       Eric L. Gibson
     Assistant United States Attorney    Anthony J. Phillips
                                         Trial Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Chad Dixon, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Chad D. Dixon
Defendant

I am the attorney for Chad Dixon. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Nina J. Ginsberg, Esq.
Attorney for Chad Dixon

17