UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :   Case No. 1:12-cr-521
                              :
                              :
CHAD DIXON,                   :
              Defendant.      :
                              :
------------------------------:
```

SENTENCING HEARING

September 6, 2013

Before:   Liam O'Grady, USDC Judge

APPEARANCES:

Uzo E. Asonye and Anthony J. Phillips,
Counsel for the United States

Nina J. Ginsberg, Counsel for the Defendant

The Defendant, Chad Dixon, in person

2

1           THE CLERK:  Criminal case number 1:12-cr-521, the

2   United States of America versus Chad Dixon.

3           MR. ASONYE:  Good morning, Your Honor.  Uzo Asonye,

4   Tony Phillips from the Public Integrity Section of the

5   Department, and Special Agent Fred Ball from Customs and Border

6   Protection.

7           THE COURT:  All right.  Good morning to each of you.

8           MR. ASONYE:  Your Honor, we would also ask at some

9   point during argument over the 3553(a) factors if we could

10  approach to discuss sealed matters.

11          THE COURT:  All right.  Certainly.

12          MS. GINSBERG:  Good morning, Your Honor.  Nina

13  Ginsberg for Mr. Dixon, who is present.

14          THE COURT:  All right.  Let's resolve our objections

15  to the Guideline calculation first, I have read the parties'

16  submissions, and several of them are pretty close issues.

17          Does the Government want to be heard further, Mr.

18  Phillips?

19          MR. PHILLIPS:  Thank you, Your Honor.  I think, if

20  the Court approves, I will just tackle them in order.  The

21  first being the mass marketing enhancement.

22          THE COURT:  I don't need a rehash.  I promise you I

23  read them carefully.

24          MR. PHILLIPS:  Of course, Your Honor.

25          THE COURT:  And looked at them and looked at the

1    Guidelines.  But if there is additional information you want to

2    provide at this time, I will hear that.

3            And I guess I am more interested in the substantial

4    interference with the administration of justice than the other

5    ones.

6            MR. PHILLIPS:  Of course, Your Honor.  I will start

7    with that and stick with that unless you want to hear more.

8            THE COURT:  Okay.

9            MR. PHILLIPS:  It is important to understand that

10   every time an individual applies for a federal job, the law

11   requires that a suitability assessment be done, including both

12   a background investigation and sort of a larger process of

13   evaluating the FS-86.  And in the case of applicants for

14   federal employment, federal law enforcement applicants,

15   particularly to Customs and Border Protection, that they

16   undergo a polygraph.

17           When a standard polygraph is done, the process is

18   quite simple, it's scheduled between the examiner and the

19   individual.  They take the polygraph, they pass, they fail.

20   And the process moves forward.

21           When an individual use countermeasures during the

22   polygraph, however, an entirely separate and additional process

23   is required.  Not only does one quality control officer, but in

24   fact two quality control officers have to stop what they do and

25   review the charts that are created by the original polygraph

1    examiner.  Additional charts are run.  And then additional

2    investigation takes place to try to ferret out where the

3    countermeasures were learned, what underlying misconduct was

4    potentially being concealed by the applicant.

5             So, it turns what is a relatively simple process into

6    quite a complicated process.  And on top of that, Your Honor,

7    all of the time and effort and energy that had spent prior to

8    that polygraph examination, conducting the background

9    investigation, interviewing neighbors, interviewing prior

10   employers, having the interview with the applicant himself, all

11   of which are part of a background investigation process

12   separate from the polygraph, all of that has to be repeated for

13   the new applicant.  Because when one applicant who has been

14   selected for polygraph fails to complete the application

15   process, these agencies have to go and find someone else.

16   There ares holes on the border that need be filed, and CBP is

17   hiring people to fill those holes.

18            THE COURT:  So, you begin with the premise that there

19   is nothing unlawful about going to an examiner and attempting

20   to understand how a polygraph examiner determines whether you

21   are telling the truth or not, is that right?

22            MR. PHILLIPS:  No, as a fundamental matter, learning

23   about polygraph from someone, from the Internet, from a coach,

24   that is absolutely protected speech.

25            THE COURT:  All right.  Then you go to a second phase

1    where you hire an instructor and you tell the instructor, I

2    need to make sure I pass this polygraph, I am by my nature a

3    nervous person -- or in the case of convicted sex abuser, you

4    know, I've gone to the penitentiary, I don't want to go back, I

5    haven't done anything wrong, but I am scared to death that

6    there is going to be a false positive and I am going to go back

7    to the penitentiary because the Probation Officer has great

8    power over me.  So, teach me what I need to do to make sure

9    that I am relaxed and can answer questions truthfully.

10            There's no problem with that, right?

11            MR. PHILLIPS:  If what the person is asking is to be

12   taught how to relax, I submit that they wouldn't go to somebody

13   teaching polygraph countermeasures.  But discussing the

14   relaxation --

15            THE COURT:  Aren't they the same?

16            MR. PHILLIPS:  I am sorry, Your Honor?

17            THE COURT:  How are they different in teaching

18   countermeasures versus teaching somebody to be properly

19   prepared to answer questions?

20            MR. PHILLIPS:  If a person is teaching someone how to

21   -- or is describing the polygraph process and describes the

22   different equipment that are used, and their only advice is, go

23   in there and tell the truth, just be relaxed, if you have

24   nothing to hide, you will do fine during your polygraph, that's

25   just good advice.

6

1              Polygraph countermeasures are something entirely

2      different.

3              THE COURT:  Well, aren't they the further information

4      necessary to go in there and relax?

5              MR. PHILLIPS:  Not quite, Your Honor.  Polygraph

6      countermeasures are behavioral, physical, and mental actions

7      that a person would take at specific times during a polygraph

8      examination to influence what is reported on the chart.

9              If your advice is merely to relax and tell the truth,

10     you're not telling them to affect the test.  You're telling

11     them to be a relaxed, honest person.

12             But when you teach a countermeasure and you say, at

13     the point the question is asked, count backwards in threes; or,

14     you know, tighten your sphincter; or whatever the

15     countermeasure is that is being taught by the coach, you're

16     telling that person to obstruct the investigation.  You're

17     telling that person to influence the natural outcome of a

18     polygraph.

19             And I would submit that if it is a state matter,

20     states may have any different laws about whether or not that is

21     illegal under state law.  I am sure a judge that learned that

22     somebody used countermeasures during a state court-ordered

23     examination would take issue with that and there may be

24     consequences.  In fact, in this case there have been

25     consequences for people who have done that.

7

1      But in the federal context, if you teach these

2  countermeasures to someone and you know that they intend to use

3  those countermeasures to affect a polygraph being administered

4  by a federal agency as part of one of these proceedings, you're

5  advising that person to break the law.

6      And in fact, if you teach them these techniques

7  knowing that that's their intended use, that they intend to use

8  them to break the law, you are an accomplish to their crime.

9  That's the nature of the charges here, and that's the effect of

10  an individual who knowingly teaches countermeasures.

11      THE COURT:  So, your response to the argument of the

12  defendant and the Probation Officer that Mr. Dixon didn't

13  decide to use the countermeasures, it was the individuals who

14  he taught, you don't think it affects the enhancement under 2J,

15  the --

16      MR. PHILLIPS:  Not at all, Your Honor.  In this case,

17  Mr. Dixon's polygraph instruction was six to eight hours of

18  practice and specific information about why they were taking

19  the test.  He would specifically ask what they sought to

20  conceal.

21      And on top of that, Mr. Dixon would specifically

22  instruct people to lie during their exam both about the conduct

23  they sought to conceal and, frankly, about the fact that they

24  were trained at all.

25      I submit that if polygraph countermeasures were

1   legitimate, if their use were legitimate, then Mr. Dixon

2   wouldn't be advising his customers to lie about it.

3   Particularly in the case of a federal investigation or a

4   federal -- a polygraph administered by a federal agency where

5   the simple fact that you are lying to that investigator is a

6   crime under 18 U.S.C. 1001.

7           So, I submit that the fact that Mr. Dixon himself was

8   not the one executing the countermeasure at the time, but was

9   merely the vehicle or the coach or the consultant, fix whatever

10  label that taught the countermeasures, because he knew they

11  intended to use them, because he advised them what to say and

12  when to say it, and importantly because he advised them to lie

13  about it, shows that he adopted their illegitimate end as his

14  own, he became a party to the crime.

15          THE COURT:  All right.  Thank you, Mr. Phillips.

16          MR. PHILLIPS:  Thank you, Your Honor.

17          THE COURT:  All right.  Ms. Ginsberg, do you want to

18  respond to the substantial interference?

19          MS. GINSBERG:  Yes, Your Honor, I do.

20          First of all, I take tremendous issue with some of

21  the representations -- what appear to be factual

22  representations that Mr. Phillips has made.

23          It is true, and Mr. Dixon has admitted as part of his

24  plea, that he advised the seven prospective federal employees

25  that if asked whether they took polygraph training, to deny it.

1    That is the only lie that Mr. Dixon has admitted to

2    encouraging, and that is the only evidence that the Government

3    has ever proffered with respect to any of these tests that Mr.

4    Dixon encouraged other people to lie about.

5            There is not a single allegation that's been made and

6    none disclosed, despite my requests, that -- and I can tell the

7    Court that the Government has advised me they've interviewed

8    these people.  This investigation has gone on for well over a

9    year.  And they have the names and the means to interview all

10   of these people.  And my understanding is that they have.

11           No one, as far as I know, has told the Government

12   that they told Mr. Dixon that they intended to lie -- conceal a

13   disqualifying -- some kind of disqualifying information, and

14   that he affirmatively assisted them in concealing any

15   information other than denying the fact that they had taken the

16   training.

17           I mean, this case raises -- and I think Your Honor's

18   questions indicate this.  There are very close First Amendment

19   questions raised by this case.  And I can tell the Court, Mr.

20   Dixon has received numerous unsolicited phone calls from

21   lawyers telling him, you don't need to do this.  You know, you

22   have a First Amendment right to do this, to give the advice

23   you're giving.  You should withdraw your plea.  Your lawyer has

24   given you bad advice.

25           And while that is troubling to me to hear, I do

10

1    believe that the Government has a basis to prosecute based on

2    the limited advice that Mr. Dixon gave to these individuals

3    that they should affirmatively deny taking his training if

4    asked in a federal -- part of a federal employment application

5    process.

6            THE COURT:  And I agreed with you at the time of the

7    plea, and I agree with you now.

8            MS. GINSBERG:  Frankly, I think it may be unfortunate

9    for law enforcement and for the federal government, but I think

10   it is protected speech to tell people how to lie on polygraph

11   tests.  I think whether the Government likes it or not, if

12   Congress thinks it should be a crime, then they have to make

13   that specific conduct a crime.

14           It is not a crime to teach people how to lie on

15   polygraph tests, particularly -- I mean, this comes in the

16   context of serious, serious question about the reliability of

17   these tests.  And not only the reliability of the tests, but

18   the conduct of polygraph examiners in conducting these tests.

19           And if I thought that that was something that was

20   going to influence the Court's decision, I would have brought

21   someone here to explain what happens in a polygraph exam.  I

22   mean --

23           THE COURT:  Well, no, I --

24           MS. GINSBERG:  I know you know that.

25           THE COURT:  I know.  And for the -- I will say it,

1    and I doubt I will ever regret it, polygraph exams are terrific

2    law enforcement tools in the general sense of law enforcement,

3    and excluding the intelligence community because I think it is

4    used for a completely different purpose and a completely

5    different method, but for the average Arlington County Police

6    Department polygraph, they are very useful tools until you turn

7    the machine on because a lot happens before the machine gets

8    turned on and a lot of people admit to crimes way before it

9    goes on.

10           MS. GINSBERG:  Precisely.

11           THE COURT:  So, I have read the literature, and there

12   is a ton of it.  And the legitimacy of polygraphs have been

13   properly criticized for decades.  But more recently, more so

14   than ever.  So, I am with you on that.

15           But the question now is, we're dealing with the

16   unlawful conduct of Mr. Dixon in the circumstances of the

17   Border Patrol officers and the undercover agents.  And under

18   the substantial interference, he teaches the countermeasures.

19   He tells them to lie about whether they have received training

20   to defeat the purposes of the polygraph, or at least to use

21   countermeasures in answering the questions.  They go forward

22   and use his techniques.  That's what I understand happened.

23           Whether they lied or they didn't lie, he wasn't aware

24   of it, but these people used those techniques in their

25   interviews, is that right?

1          MS. GINSBERG:  Well, apparently so.

2          THE COURT:  Okay.

3          MS. GINSBERG:  That's the representation that the

4  Government has made.  I have no --

5          THE COURT:  You weren't given that information?

6          MS. GINSBERG:  I was not given that information.

7  Well, the Government did state in one of its pleadings that two

8  of the seven admitted to using the countermeasures.  I don't

9  know if they admitted it when they were asked the first time.

10          I think that -- I know that the examiners, the

11  government polygraph examiners are trained in detecting

12  countermeasures.  So, my -- and this is an assumption, but I

13  would suspect that people were confronted -- some of these

14  individuals were confronted by the government examiner because

15  they had suspicions, and at least some of them said yes.  And I

16  don't know if the other ones did or didn't.  And we don't know

17  if that -- in fact, we don't know if any of these people were

18  in fact, despite using the countermeasures, if any of them were

19  hired or permitted to retain their past government employment.

20          So, for the Government to ask the Court to conclude

21  that there was a substantial use of resources as a result of

22  Mr. Dixon's conduct without any factual basis, I think is

23  improper, for one.  I don't see how the Court can possibly do

24  that.

25          But I also would -- I also agree with the Probation

1    Officer that Mr. Dixon gave them advice.  He didn't know if

2    they were going to follow that advice.  He didn't know if they

3    were in fact going to use the countermeasures, if they would

4    think better of it at the time they took the tests.  He didn't

5    do anything to influence their individual decisions whether or

6    not to go through with using the countermeasures, or to deny

7    taking countermeasure training, or whatever you want to call

8    it.

9           THE COURT:  Well, they were there for a reason, and

10   they paid him handsomely.

11          MS. GINSBERG:  Well, they made him $1,000.  So, you

12   know, it's fair to assume that they would.  But there are some

13   people who -- there are people who maybe plan to rob banks, and

14   they go and they find out from someone what's the layout of the

15   bank.  And the former bank employee says, well, there is a

16   teller that sits here, and there is a teller that sits there,

17   and there is a guard at the door.  And then they say, wait a

18   minute, I don't want to get caught, and they don't rob the

19   bank.  Has that person committed a crime?  I think it's a close

20   question.

21          You know, you can tell people to do anything.  You

22   have to really -- you have to know that they are actually going

23   to use that in terms of facilitating the crime.  And while you

24   might assume that that's the case if somebody goes to the

25   efforts of getting the training, he didn't put any -- you know,

14

1    he didn't put his arm around anyone's neck or twist anyone's

2    arm and say, you better do this or you're not going to get a

3    job.  He gave them the wherewithal to do if they decided that's

4    what they wanted to do.

5           But I also think that in terms of -- in order for the

6    enhancement to apply, the Government has to prove that

7    substantial resources were expended as a result of the offense

8    conduct.  And to say that two other people have to review a

9    chart and maybe they have to give -- this is assuming that the

10   people didn't admit -- we don't know if any -- we know several

11   of these seven did admit.

12          But assuming they had to do their own investigation

13   to find out if the countermeasures were used, having two people

14   review a chart, maybe running another polygraph exam, that just

15   isn't the kind of expenditure of resources that the Guideline

16   contemplates.

17          We also don't know if there were other, there was

18   other, there were other -- if the people were not hired or

19   retained, if there were other factors that were developed

20   through the employment application process that would have

21   qualified them so they would have to find another employee,

22   another potential employee.

23          I mean, there is no evidence that in this case there

24   were substantial resources.  Substantial, I mean, substantial

25   means more than a few hours of somebody's time.  But there is

15

1    no evidence that substantial resources were expended as a

2    result of the offense conduct in this case.

3            THE COURT:  Thank you.  All right.

4            Do you want to be heard in reply briefly?  And

5    respond to Ms. Ginsberg's statements about what she was

6    provided in terms of these seven individuals.

7            MR. PHILLIPS:  Of course, Your Honor.  In terms of

8    what Ms. Ginsberg was provided, we gave her access to all of

9    the transcripts from all of our debriefings with Mr. Dixon, as

10   well as all the transcripts of all of the undercover operations

11   that we did, all of the undercover phone calls.  So, she has

12   more than --

13           THE COURT:  We're focusing on the seven individuals

14   who you have subsequently interviewed, and two of them

15   evidently admitted that they used countermeasures, is that

16   correct?

17           MR. PHILLIPS:  That's correct, Your Honor.

18           THE COURT:  When did that take place?

19           MR. PHILLIPS:  Boy.  Over the course of --

20           THE COURT:  Was it during the polygraph examination?

21   Was it subsequent --

22           MR. PHILLIPS:  The admissions?

23           THE COURT:  The admissions, right.

24           MR. PHILLIPS:  So, one of the admissions came during

25   a polygraph.

1          The reason I mentioned that we provided transcripts

2     is I want to point out a fact that supports our notion, our

3     allegation that Mr. Dixon has a very robust role in the use of

4     countermeasures by his clients.  And these are words of his

5     that come from a transcript.  He says, and I am quoting here,

6     "there is a guy in Oklahoma City that offers similar training

7     to what we do.  He spends one hour with you.  He doesn't go

8     over questions, doesn't do any of that, doesn't cover what to

9     say, and that's the difference between us."

10          And the reason I share that is because Mr. Dixon

11     spends six to eight hours with his clients covering precisely

12     what to say.  In both of our undercover operations he

13     consistently asked what the underlying misconduct was and told

14     them how to avoid being discovered, how to conceal that

15     conduct.  He specifically told both of our undercovers how to

16     deflect any attention away from those issues.  And again, these

17     are eight-hour trainings, not one hour as with the individual

18     in Oklahoma City.

19          Of course, we don't know what he told every single

20     one of his customers, we weren't there.  But for the two

21     occasions that we were there and that we recorded and that we

22     have his words, we know that it began with, what are we here

23     about.  And we know that he told them to conceal it.  We know

24     he told them not to admit it.  And we know that he told them to

25     lie about it.

1          THE COURT:  All right.  Thank you.

2          All right.  Well, we are focusing now on whether

3    there are any enhancements appropriate to the Guideline range

4    that was determined to be an adjusted level 14, and whether or

5    not mass marketing or sophisticated means or the substantial

6    interference are appropriate to change that Guideline range to

7    one that the Government seeks.

8          There is clearly not any mass marketing as 2B1.1

9    defines it.  We're talking about a small audience with an

10   elementary Web site which was improved at some stage, a small

11   number of victims.  And I don't find that the mass marketing

12   applies.

13         Nor do I find that sophisticated means applies.  Mr.

14   Dixon took an interest in polygraph examinations at a time

15   prior to beginning his business.  He went on the Internet, as

16   have thousands and thousands of people, to look at polygraph

17   history and its use or misuse.  He looked at Mr. Williams', I

18   think, book and developed a pretty elementary model on how to

19   start his own business using publicly available information.

20   And there is nothing unlawful about 95 percent of the business

21   that he conducted.

22         So, there are no facts here which compel a finding of

23   a substantial means.  I think the Probation Office is correct

24   about that.

25         The substantial interference is a close issue.  The

1    Guidelines for this are imprecise.  There is no help in the

2    Guidelines manual itself as to references of to how to apply it

3    or not apply it.  But when we're focussed on the number of

4    people who he has been charged and admitted to advising

5    unlawfully, we're talking about a very discrete number, not 100

6    or 69 or whatever number we come up with ultimately on the

7    overall number of clients that he had.

8            And also, because I'm uncertain as to whether the

9    Guideline was to be applied when it's not the person making the

10   statements, but instead an advisor who is not ultimately

11   deciding whether they are going to attempt to obstruct justice,

12   only the instructor, I think that I'm required by law to come

13   down on the side of the defendant and not find the

14   sophisticated means.

15           So, as a result, I find that the Guideline range has

16   been properly calculated and that Mr. Dixon's Offense Level

17   total after acceptance is a 12.  He is a Criminal History

18   Category I.  And that results in a 10 to 16-month Guideline

19   range.

20           Are there other amendments that the Government seeks

21   to the report?  Mr. Phillips, anything else that the Government

22   things is inaccurate in the report?

23           MR. PHILLIPS:  Your Honor, I just wanted to point out

24   that there was also a dispute regarding whether or not his

25   offense was extensive in scope, planning, or preparation.

19

1          THE COURT:  I am sorry.  When you're looking at the

2   number of unlawful acts, I don't think that the scope,

3   planning, or preparation applies either.  Thank you.

4          Ms. Ginsberg, any other modifications you seek in the

5   report?

6          MS. GINSBERG:  No.  In fact, because the Government

7   has several times in its papers referred to the number of

8   customers as 69 to 100, I just would point out for the Court

9   that the Probation Officer was given access to the records, and

10  she concluded that there were approximately 50 customers.

11  Which is much more in keeping with what Mr. Dixon's

12  recollection was.

13         THE COURT:  All right.  Mr. Dixon, have you gone over

14  the presentence report?

15         THE DEFENDANT:  Yes, I have.

16         THE COURT:  Any additions, corrections you want to

17  make to the report at this time?

18         THE DEFENDANT:  No, sir.

19         THE COURT:  All right, have a seat.

20         All right.  Then I will have the report filed without

21  amendment.

22         And I have read the parties' submissions.  I have

23  read the many letters in support for Mr. Dixon.  There was a

24  supplemental filing by Mr. Dixon concerning certain other

25  matters.

Under Seal Side-Bar Conference

20

1          Why don't we approach the bench at this time and

2  discuss those.

3          NOTE:  An under seal side-bar discussion is had

4  between the Court and counsel as follows:

5  AT SIDE BAR

6          /////////////////////////////////////////////

7  ////////////////////,

8          /////////////////////,

9          ///////////////////////////////////////////////

10 ////////////////////////////////////////////////////////

11 /////////////////////////////////////////////////////////

12 //////////,

13         //////////////////////////////////////////,

14         ///////////////////////////////////////////////

15 ////////////////////////////////////////////////////////,

16 ///////////////////////////////////////////////////////,

17 /////////////////////////////////////////////////////////

18 ////////////////////////////////////////////////////.

19         //////////////////////////////////////////////.

20 //////////////////////////////////////////////,

21 /////////////////,

22         ///////////////////////////////////////////////

23 //////////////////////////////////////////////////////////,

24 ////////////////////////////////////////////////////,

25 ////////////,

21



Under Seal Side-Bar Conference

22





Under Seal Side-Bar Conference

24



Under Seal Side-Bar Conference

25



under seal Side-Bar Conference

26



1 //////////////////////////////////////////////

2 ///////////////////////////////

3 ////////////////////////////////

4 //////////////////////////////

5 ////////////////////

6          NOTE:  The under seal side-bar discussion is

7 concluded; whereupon the case continues in open court as

8 follows:

9          THE COURT:  All right.  Mr. Phillips, I have read the

10 Government's position on sentencing.  I will hear anything

11 additional you would like to say at this time, sir.

12          MR. PHILLIPS:  Thank you, Your Honor.

13          Your Honor, already this morning we have had

14 discussion about these charges, why they were brought, and the

15 purpose for this investigation and this prosecution.

16          I submit that we are here today for a simple and

17 straightforward reason.  Mr. Dixon chose enrich himself by

18 teaching others how to convincingly lie, cheat, and steal.  He

19 taught his customers how to manipulate polygraph examinations

20 that were conducted as part of a process to weed out from the

21 law enforcement community those who are not suitable to serve.

22 He taught them how to cheat.

23          As we've already discussed, he spends hours with his

24 clients discussing the specifics about their situation, their

25 misconduct, the circumstances of their examination, based on

1   our undercover operations, and tells them what to say and what

2   not to say.  And ultimately he encourages them to deny their

3   misconduct, and he directs them to lie about whether they

4   received training.  He directs them to lie to federal

5   investigators, which by itself is a crime.

6          And he tells his customers both during the polygraph

7   examination itself and during the pre and postinterview exactly

8   how to behave, what to say, what not to say in order to

9   manipulate the situation so that they can get jobs for which

10   they are not qualified.  He teaches them, effectively, how to

11   steal.

12          And he does this for a lot of money, for a minimum of

13   $1,000.  It's a thousand dollars per day plus expenses.  That's

14   a $356,000-a-year job.  He is not doing it out of the goodness

15   of his heart.  He is not doing it because he is opposed to

16   polygraph necessarily.  He is doing it for of money.

17          Your Honor, this is a case about a man, Chad Dixon,

18   who got paid a lot of money to teach people how to convincingly

19   lie, cheat, and steal.

20          And to be sure, Mr. Dixon was well on his way to a

21   career of criminal deceit.  This wasn't something -- this

22   teaching countermeasures isn't something he did for fun.  It is

23   not something that he did once or twice for friends because he

24   thought it was interesting.

25          As he admitted to Probation or as he told Probation,

1   he did this between 70 and 100 times.  That came from him.  In

2   the PSR, paragraph 97, he is the one that estimates that this

3   was how frequently he did this.

4         And, Your Honor, at $1,000 per day, that's -- well,

5   doing the math, 70 to 100 customers, over 18 months, that's

6   four to six trainings per month, that's 4,000 to $6,000 per

7   month, two to three times what he has told Probation he makes

8   through his legitimate business.  This was a money maker for

9   him, Your Honor.

10        And we're here because instead of investing in his

11  legitimate business that he inherited from his father and

12  making that work, he invested in this enterprise which includes

13  teaching people how to lie.  That's why we're here.

14        And this crime matters because what he did endangered

15  others.  There is a reason that federal law requires that these

16  preemployment suitability determinations are made.  In fact,

17  just in 2010 Congress passed a law, the Antiborder Corruption

18  Act, that requires CBP to conduct polygraph examinations of all

19  of their law enforcement personnel.

20        And that is done because these individuals who work

21  for the federal government have access to incredible amounts of

22  information.  They have tremendous authority, both on the

23  border and in the exercise of their daily jobs.  And they have

24  tremendous and significant law enforcement powers.  And if this

25  authority and this information, if these powers are abused, it

1   can cause real harm.

2           This investigation began when Customs and Border

3   Protection in April of 2011 caught one its applicants using

4   countermeasures on an exam.  And that applicant later admitted

5   that he had been trained by Dixon.  One month later, yet

6   another CBP Border Protection applicant, law enforcement

7   applicant, was caught using countermeasures learned from Mr.

8   Dixon.

9           These individuals were applying for jobs guarding

10  America's borders.  CBP's mission is to keep bad things and bad

11  people out of the country, illegal drugs, crossborder crime,

12  frankly, terrorists.  Helping unqualified applicants obtain

13  these federal law enforcement jobs is a serious and legitimate

14  threat to the nation's safety and security.  Your Honor, that's

15  fact.  That's not hyperbole.  That's not the Government putting

16  a spin on any of this.

17          Your Honor, Mr. Dixon was willing to train anybody.

18  For $1,000 per day, it didn't matter who you are, it didn't

19  matter what you had done, Dixon was willing to help you get the

20  job.  He was willing to help you obstruct or avoid your

21  court-ordered supervision.  He was willing to help you get that

22  security clearance.

23          We sent two undercover agents in to probe just how

24  far Mr. Dixon was willing to go.  That was the purpose for that

25  investigative tool.  The first agent told Mr. Dixon that she

1   was a former local jailer who had resigned her position after

2   she was caught smuggling contraband into a jail.  She also told

3   him that she regularly used drugs.  And she told him that she

4   was applying for a job to guard the border.

5          And knowing this, knowing that he was training

6   someone who was an admitted smuggler trying to get a job

7   guarding the border, he trained her.

8          Our second undercover agent went in and told Mr.

9   Dixon, I have a brother who I have left off of all of my forms,

10  I lied about him on my background investigation because he is a

11  member, an enforcer in fact of the Los Zetas cartel.  And this

12  was an individual who was telling Mr. Dixon that he was

13  applying to patrol the U.S./Mexico border.

14         He also told Mr. Dixon that he would routinely give

15  his brother his passport so that the brother could come and go

16  across the border unimpeded.  And his brother would use that

17  passport and cross the border so he could commit crimes on the

18  American side of the border.  This second undercover agent also

19  told Mr. Dixon that he was actively having sex with an underage

20  girl.

21         Mr. Dixon trained him.  Mr. Dixon actually told him,

22  told the agent that by helping his brother, he was committing

23  treason, and that's a quote from the transcript.  Mr. Dixon

24  also warned the agent that he could do 15 to 20 years in prison

25  if he was caught for what he was doing.

1           So, Mr. Dixon knew exactly, he knew perfectly well

2      that he was training a criminal.  He knew perfectly well that

3      he was training somebody that was trying to get this job and

4      had no business being in a law enforcement position or guarding

5      the border.  But Mr. Dixon was charging up towards of $2,500

6      for his eight hours of service, and that's all that mattered.

7           And as we've pointed out in our papers, Mr. Dixon

8      didn't only train criminals who were trying to get federal law

9      enforcement jobs.  He trained individuals trying to obtain or

10     retain security clearances.  On at least two occasions he

11     trained federal contractors who were then holding top secret

12     securities clearances, one who was employed by the FBI and

13     another who was employed within the intelligence community,

14     within the federal intelligence community.

15          It didn't matter to Mr. Dixon that these individuals

16     had access to the nation's secrets.  He trained them anyway.

17     That's why we're here.

18          But to truly understand, we would argue, how callous

19     Mr. Dixon was about the impact of his actions, consider that he

20     routinely trained convicted sex offenders who were required by

21     state court order to submit to polygraphs as a condition of

22     their probation or plea.

23               MS. GINSBERG:  Judge, I don't --

24               THE COURT:  I understand.

25               MS. GINSBERG:  I don't normally object during

1   someone's argument, but he is not charged with these offenses.

2   There has never been a determination that that was illegal

3   conduct.  And this is inappropriate argument.  It is

4   inflammatory.  It is designed for the people in the courtroom

5   and the reporters sitting here to write something that says how

6   awful it is to use legal polygraph training.  And it's just

7   inappropriate.

8           MR. ASONYE:  Your Honor, it's in the statement of

9   facts, Your Honor.

10          MR. PHILLIPS:  And on top of that, Your Honor, it is

11  appropriate under 3553(a) --

12          THE COURT:  I will allow it under the 3553 factors.

13  And I understand your argument, Ms. Ginsberg.

14          MR. PHILLIPS:  Thank you, Your Honor.  In any event,

15  at least nine of these nine convicted sex offenders -- or,

16  excuse me, at least two of the nine -- at least two of the nine

17  convicted sex offenders that we were able to identify and that

18  we know he has trained live in this area.

19          And his training worked, Your Honor.  The individual

20  named JO who is mentioned in the papers and is included in the

21  documents, lives in Fairfax, Virginia, and between 2008,

22  October 2008 and March 2011 he failed seven polygraph

23  examinations.  In June of 2011 he told us he was trained by Mr.

24  Dixon.

25          Between late June of 2011 and June of 2012, JO has

1    since passed three polygraphs in a row.  So, this is training

2    that works.

3            Mr. Dixon knew that he was training people who

4    intended --

5            THE COURT:  The Government has notified the Probation

6    Departments of these various individuals of their training, is

7    that correct?

8            MR. PHILLIPS:  Indeed, Your Honor.

9            THE COURT:  All right.

10           MR. PHILLIPS:  In fact, Your Honor, that was a

11   significant part of the reasons why we -- it was very important

12   to the Government, despite the fact that these aren't federal

13   crimes, to make sure that something was being done.

14           So, we have to consider what that means.  Mr. Dixon

15   is knowingly training clients convicted of sex offenses.  He is

16   knowingly training people to beat polygraphs that are meant to

17   protect communities from sexual predators.  Again, this is not

18   hyperbole.  This is why we're here.

19           THE COURT:  But he is not charged with these crimes.

20           MR. PHILLIPS:  Correct.

21           THE COURT:  So, to the extent that it goes to the

22   3553 factors, deterrence to him, deterrence to others, you

23   know, the seriousness of the offense -- it doesn't go to the

24   seriousness of the offense because these are not charged

25   crimes, and I am not going to consider that as such.

1           MR. PHILLIPS:  Of course.

2           THE COURT:  But it goes to his criminal intent.  It

3   goes to his state of mind when he committed these other crimes

4   perhaps.  But let's move to the gravamen of the offenses that

5   he has pled guilty to.

6           MR. PHILLIPS:  Okay.  Your Honor, if I may, I want to

7   touch -- I want to go a little bit further on this only because

8   we anticipate based on the defense's submission --

9           THE COURT:  Well, I will give you a reply then, but I

10  don't want to hear any more about the sex offenders.

11          MR. PHILLIPS:  Okay.  So, if we're talking about the

12  criminal intent and the characteristics of this particular

13  defendant, I think it's important that we don't speculate about

14  his motives or speculate about what was driving him.  We have

15  Mr. Dixon's words from these undercover operations that tell us

16  all we need to know.

17          The second undercover agent told Mr. Dixon, I have a

18  lot of stuff to hide.  He told him, I've been sleeping -- he

19  explained to Mr. Dixon that he was currently then having sex

20  with a minor.  And Mr. Dixon replied to him, you can't talk

21  about that, you can't talk about it.  He said, I could care

22  less.  Those are Mr. Dixon's words.  And I will clean up some

23  of the language here, but what Mr. Dixon said was, it doesn't

24  make a difference, it's not my daughter you're having sex with.

25          Mr. Dixon went on to say, it doesn't make me any

1    matter.  Your information is confidential as long as you don't

2    mess with my money.

3            Your Honor, Mr. Dixon told the agent, if I get

4    there -- because at this point Mr. Dixon hadn't received his

5    money from Western Union for a second undercover operation.  He

6    said, if I get there and my payment is gone, I'm going to run

7    my mouth.  I'm going to call straight up to the Department of

8    Homeland Security, to the Border Patrol, and I am going to

9    throw a fit.

10           This statement or this exchange encapsulates what

11   this was all about.  Mr. Dixon was in this for money.  He knew

12   he was training individuals.  Frankly, he knew that he could go

13   to the Department of Homeland Security or Border Patrol and

14   report them because what they were doing was wrong, but he

15   didn't care.  At that moment when the Government wasn't

16   listening, when he wasn't facing sentencing or talking to his

17   family or his community or this Court, the truth about his

18   intentions came out.  I mean, it's not my daughter, that's why

19   we're here.

20           Your Honor, Mr. Dixon embarked upon a career of

21   criminal deceit.  This is what he intended to do and would have

22   continued to do had he not been caught.  And his crimes matter.

23   They matter to the honest and selfless and law-abiding law

24   enforcement officers that stand on the border and do their job

25   and have to rely on and trust the other individual standing

1  there next to them, and they can only hope that they are

2  appropriate and that they should be there.

3        These crimes matter to the neighbors and the families

4  that share their communities with these convicted sex offenders

5  who are required by courts to take these polygraph examinations

6  to keep everybody safe.

7        And, Your Honor, Mr. Dixon's crime should matter to

8  all Americans because our national borders and our nation's

9  secrets are jeopardized by his knowing crimes.  Your Honor,

10  that's why we're here.

11        THE COURT:  Thank you, Mr. Phillips.

12        Ms. Ginsberg.

13        MS. GINSBERG:  Your Honor, I think I responded to the

14  type of hyperbole this is in my pleadings, and I am not going

15  to do that again, but I think it is unwarranted and I think it

16  is an intentional attempt to deviate or --

17        THE COURT:  It goes to the motive.

18        MS. GINSBERG:  I understand, but --

19        THE COURT:  Why am I doing this.  Mr. Dixon faced a

20  financial crisis.  He felt responsible for taking care of his

21  family, his extended family, his mother.  He had a heck of a

22  lot going on.  It was during a time of our economy tanking and

23  his business evidently having -- but he made the decision to

24  move into this line of business.  I have no doubt that he did

25  not enjoy training sex offenders that he was paid to do, but he

1    took the money.

2          And the motivation was greed.  You know, he just felt

3    this money was more important than being morally responsible to

4    his community.

5          And I understand the First Amendment argument, but

6    there is relevance to the fact that he was training sex

7    offenders for that reason.  I think that is proper for me to

8    consider in the motivation.

9          The argument that Mr. Dixon appears to make that he

10   thought that polygraphs were a bunch of boloney, may be

11   absolutely true.  There is a whole lot of people that believe

12   it, that they shouldn't be used in determining eligibility for

13   jobs.  There is a whole lot of people believe that, and he may

14   also believe that.

15         But I think equally he went into this business for

16   greed, and he wasn't as concerned as he should have been about

17   the protection of his community.

18         MS. GINSBERG:  Well, let me address some of those

19   issues.  First of all, I do think that the fact that he

20   believed -- his belief in the polygraph or the misuse of

21   polygraph exams may have clouded some of his judgment, I

22   certainly concede that.

23         However, knowing -- there is no evidence that Mr.

24   Dixon knowingly trained someone who he had any reason to

25   believe would commit future misconduct.

1          THE COURT:  How about the second undercover agent

2     where he gets back to him and says, you know, thanks for the

3     training, it worked.  And by the way, it was my brother that

4     paid your fee.  And he says, you know, tell him thanks.

5          MS. GINSBERG:  But this is also -- this was eight

6     hours.  And it is kind of taken out of context because there

7     were other portions of that recording where Mr. Dixon is

8     telling him, as Mr. Phillips said, if you continue to do what

9     your brother did before, you're going to get charged with

10    crimes that could land you in jail for a long time.

11         There is no indication -- and I have listened -- I

12    listened to that recording.  There is no indication during

13    either of the undercover training sessions that -- no statement

14    by either of those individuals that they intended to do

15    anything illegal in the future if they got the jobs.

16         THE COURT:  All right, I understand.

17         MS. GINSBERG:  So, what they were doing was learning

18    how to conceal past misconduct.  And Mr. Dixon had -- in fact,

19    during the second undercover he said, you're going to be asked

20    about these things.  You have to be prepared to answer them,

21    and maybe you just shouldn't apply for this job.

22         But there was no indication ever in any of those

23    undercover training sessions, no statement that suggested in

24    any way that those individuals were going to commit future

25    illegal acts or that they would not be appropriate -- they

1   wouldn't have gotten hired had their pasts been known, but

2   there was no indication that these individuals were going to

3   continue to engage in any kind of misconduct.

4           And the same is true of -- and the sex with the

5   minor, this was a young girl in Mexico.  I don't even know if

6   it's illegal to have sex with a 16-year-old in Mexico, it may

7   not even be illegal.

8           But with respect to the sex offenders, one person

9   came to him and told him that he was having an ongoing

10  relationship with a minor.  And Mr. Dixon stopped the training

11  and found the man's Probation Officer in Texas and called him.

12          The fact that someone who was a sex offender who had

13  failed seven polygraph exams and now started -- Mr. Phillips

14  didn't tell you that they violated him for failing seven

15  polygraph exams.  It didn't matter.  The Government didn't --

16  whoever was his Probation Officer and the court didn't think

17  that this man was enough of a risk to put him back in jail when

18  he failed seven polygraph exams.

19          To say that Mr. Dixon's training him so that he

20  passed the next three put the community at further risk is

21  just -- it's a smoke screen.

22          And the same is true of the other sex offenders.  We

23  all hate the fact that people commit those kinds of crimes.  I

24  represent people that commit them, but I hate the fact that

25  these crimes occur.  It's still -- someone who has committed

1   one these offenses who is afraid of getting put back in jail

2   because of something that he did in the past, or the way he

3   explains his conduct, or he didn't fully admit the extent of

4   his conduct during his plea so he's hiding something that will

5   make him fail a polygraph, that does not make the person a

6   future danger to the community.

7           And while I think it was shortsighted of Mr. Dixon, I

8   don't think he was doing something -- and I think he was

9   careful not to do anything that he thought was going to put the

10  community at risk.  And I think that that is a significant

11  factor.

12          There are a number of other things.  When we say

13  greed, his business was in serious jeopardy.  He was facing

14  foreclosure.  He was desperate and he made some bad decisions.

15  But again, most of what he was doing was legal.

16          And as far as his intent, he learned about this

17  polygraph training mostly from what he read, but he followed

18  almost to a T what Doug Williams was advertising he was doing.

19  And Doug Williams is a former police officer.  He has testified

20  in front of Congress.  He is recognized -- he has spoken all

21  over the national media.  He influenced the legislation that

22  prohibits the use of polygraphs in private employment.  He is a

23  member of some technology group that advises Congress.

24          Mr. Dixon was not unreasonable in thinking, if a

25  person like this with this type of background can say that you

42

1   can go out and tell the community, I can teach you how to lie

2   and pass a polygraph, that he wasn't doing anything wrong.

3          The Government -- I mean, Doug Williams has been

4   making these representations for I don't know how many years,

5   25 years maybe.  He has trained close to 5,000 people.  And at

6   least whatever the Government's intentions are with respect to

7   Mr. Williams, they know he is well-healed and they know he is

8   going to raise a first First Amendment objection.  He isn't

9   standing before this Court yet.  Mr. Dixon is.

10          And in terms of Mr. Dixon encouraging people to

11  engage in misconduct, I just don't think that there is evidence

12  of that.

13          And I think it's also interesting that given the

14  opportunity to tell this Court that the seven federal

15  employees -- Mr. Phillips said they were unqualified for the

16  employment.  Well, what we know, what made them unqualified --

17  the only thing that we know that made them unqualified is the

18  fact that they denied having countermeasure training.

19          We don't know if the Government hired any of these

20  people, retained any of these people.  We don't know if they

21  weren't hired, if it was for some other reason.

22          And to say that Mr. Dixon is responsible for the

23  possibility of unqualified people having these jobs, we just

24  don't -- there is know factual basis for that.  It may be true,

25  but as far as I know, and at this point as far as what the

1   Court knows, what made them unqualified was the fact that they

2   misrepresented the fact that they had had this polygraph

3   training.

4         So, Mr. Dixon, his views about the polygraph may have

5   clouded his judgment, but I think what he also -- knowing what

6   he did about the way polygraphs work, and the way the examiners

7   handle the pretest interviews, and what they tell people about

8   polygraphs, and why they may in fact result in people making

9   confessions to criminal offenses, I think he saw in a way what

10  he was doing was levelling the playing field.  He was teaching

11  people how not to be tricked by the polygraph examiner into

12  believing that when you have a reaction, it means you're lying.

13  Which is what they tell you, and which is not true.

14        So, I can't say he was doing a good deed, but he was

15  not committing a crime.  And I think in his own way, you know,

16  he saw this as levelling the playing field.

17        People when they are in financial distress, they make

18  decisions which in retrospect they usually regret having made.

19  But to say that Mr. Dixon was embarking on a career of criminal

20  deceit is just -- I think a gross exaggeration.  He was trying

21  to supplement his income for the electrical contracting company

22  which he took over after his father died in a gruesome

23  accident.

24        That was his career.  His career wasn't teaching

25  polygraph exams.  He was not about to abandon this family-owned

1    business, it was the last connection he had with his father who

2    almost died in his arms.  That is the man that Mr. Dixon is.

3    He made some bad choices under some severe financial stress.

4         But it is clear that Mr. Dixon is not the kind of

5    person that the Government is trying to portray him as.  He is

6    a very decent, decent person by the accounts of everybody who

7    has written to the Court, including lawyers and bankers and --

8         THE COURT:  Police officers.

9         MS. GINSBERG:  Police officers.  Who can't believe

10   that he is in this situation, knowing his character over the

11   years, knowing what he has contributed to his community.  I

12   mean, he has taken on it himself to help kids that can't get to

13   a baseball game because their parents can't give them the money

14   to pay the bus, and he makes sure these kids participate.

15        This is not an evil man.  This is a very decent man

16   who made bad choices in the context of very ill-defined law.  I

17   think it is clear that he did not believe he was breaking the

18   law.  When the agents came to his house with a search warrant,

19   they left without some of the documents, he ran after them and

20   said, here, wait.  He wasn't trying to hide what he was doing.

21        And during the last undercover operation he is asked,

22   well, what are you going to do if they find about you?  He

23   said, they know, I am sure they know about me, I am not doing

24   the anything illegal.

25        I don't believe that Mr. Dixon -- I don't believe the

1    Court has any reason to believe that Mr. Dixon knowingly set

2    out on a course of conduct that he knew was illegal.

3          And I don't believe that the country knows, the

4    citizenry at large knows that this is illegal conduct.  I mean,

5    that's why lawyers are calling him from all over the place

6    telling him, you don't have to do this, you have got a First

7    Amendment right to do it.  That's why Doug Williams is going to

8    fight whatever prosecution he is faced with because he believes

9    he has a First Amendment right to do what he is doing.

10         This is admittedly the first prosecution of this

11   nature in the country, and I am not going to say that it didn't

12   need to be brought because I think the Government has some very

13   legitimate concerns, but to say that a man who is a good and

14   decent man, who didn't believe he was violating the law, ought

15   to go to prison at the expense of losing his only means of

16   livelihood, the livelihood of his family, and other people who

17   depend on him, and a man who has throughout the rest of his

18   life demonstrated that he is someone that the community truly

19   respects and looks to -- he puts roofs on peoples' houses when

20   they can't afford to get a roofer.  There is a storm and he

21   goes to someone's house when their electricity isn't working.

22   And he doesn't charge these people money.

23         And I don't think, in terms of the legitimate 3553(a)

24   concerns about deterrence and the message that gets sent and

25   respect for the law, in a case where the law has never been

1    enforced in this fashion before, to send Mr. Dixon to prison is

2    extremely more than necessary in order to effect a fair

3    punishment.

4            THE COURT:  All right.  Thank you, Ms. Ginsberg.

5            Mr. Dixon, please come to the podium.  This is your

6    opportunity to tell me anything you would like to before I

7    sentence you.  And please remain there after you are done.

8            THE DEFENDANT:  I regret the choices that I've made

9    that puts me here in front of you today.  If I could turn back

10   the hands of time, I would take all of this away and I would be

11   in Indiana and not in your courtroom right now, but I can't.

12           I agonize over the pain this has caused my family,

13   but none more than my kids.  I worry about the looming

14   financial struggles that this has brought on.  I worry about my

15   mom's health.

16           Definitely one of the largest regrets of my life, bar

17   none.  If I could take it back, I would.

18           THE COURT:  All right.  Well, you're right, this is

19   so unfortunate.  The consequences of your actions, as almost

20   every defendant who comes in front of me, go so far beyond the

21   defendant, but to family and children and to communities.

22           And I am not worried that you are going to commit

23   another offense of this nature, and I think that you fully

24   understand what you did was unlawful in instructing the

25   prospective law enforcement officers in these techniques and

1   telling them to lie about whether they received countermeasure

2   training.

3          The undercover operation that the Government ran to,

4   I guess, determine the extent of how far you were willing to go

5   in training anyone, are the only neutral evidence that I have.

6   And they demonstrate that anyone who thought about it for a

7   minute, and you thought about it a lot, I am sure, knew that

8   advising UC-1 and UC-2 was unlawful and, as importantly,

9   potentially caused a great deal of damage to your community, to

10   our communities, to every community.

11          And a sentence of incarceration is absolutely

12   necessary under the guidelines to deter others from this type

13   of conduct, to represent the seriousness of the offense that

14   you did commit, the unlawful offense, and, as I have indicated,

15   the dangers that you created to our community, which are

16   serious ones.

17          On the other hand, for the reasons we talked about at

18   the bench, and I think that considering the history of Mr.

19   Williams' in fashioning the appropriate sentence, is absolutely

20   appropriate, as Ms. Ginsberg has suggested.

21          The gray areas between the First Amendment rights to

22   teach these countermeasures in the polygraph world are real,

23   they have existed for an extended period of time, and Mr.

24   Williams has employed them without any kind of interference

25   from law enforcement that I am aware of, and continues to do

1    so.

2              But for the extent to which you went and deviated

3    from that in the offenses that you committed, there still is a

4    period of incarceration that's necessary, but certainly not a

5    Guideline sentence.

6              I am going to sentence you to eight months of

7    incarceration on each of these offenses, to run concurrently.

8              Impose a special assessment of $100 as to each of

9    these offenses.

10             Order that you serve a period of three years of

11   supervised release on each of the counts, to run concurrently.

12             I will order that you pay the restitution that has

13   been agreed upon in the forfeiture order that I have entered.

14             I will not impose a fine or costs of incarceration

15   because I find you are unable to afford them.

16             And I will allow you to self-surrender.

17             Is there a designation that you seek?

18             MS. GINSBERG:  Your Honor, a camp that is as close to

19   Marian, Indiana that is available.

20             THE COURT:  All right, I will recommend a camp that

21   is close to Marian, Indiana.  I will recommend that.  I wish I

22   had faith that they would listen, but that doesn't happen very

23   often.

24             And I hope and trust that the many people that have

25   supported you, family, friends -- you have done a great deal of

49

1    good to your community, and I have considered that extensively

2    in the sentence.  I hope that they will help you now because

3    there should be a way to keep this business operating with your

4    brother and family for the five or six months that you're going

5    to be out of action.

6              You certainly have a loving fiancée who can do all

7    she can to keep the family together.

8              And I think that if you ask for help, you'll get it.

9    And you ought to ask for help.  And I very much hope that you

10   come out and go back to contributing to your community as you

11   have in the past.  And I wish you luck and the best in doing

12   so.

13             All right.  Anything else in this matter?

14             MR. PHILLIPS:  Not from the Government, Your Honor.

15             THE COURT:  All right, thank you.  You are excused.

16   ------------------------------------------------
                      HEARING CONCLUDED

17

18

19

20             I certify that the foregoing is a true and

21        accurate transcription of my stenographic notes.

22

23
                  /s/  Norman B. Linnell
24                Norman B. Linnell, RPR, CM, VCE, FCRR

25